IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

JOHN R. JAMISON,                          )
                                          )
                    Plaintiff,            )     Case No. 03-1036-KI (lead case)
                                          )     Case No. 04-31-KI
          vs.                             )     Case No. 04-76-KI
                                          )
OLIN CORPORATION-WINCHESTER               )     OPINION AND ORDER
DIVISION; U.S. REPEATING ARMS             )
CO., INC.; BROWNING; BROWNING             )
ARMS CO.; and G.I. JOE'S INC.,            )
                                          )
                    Defendants.           )

        Robert A. Shlachter
        Timothy S. DeJong
        Jacob S. Gill
        Stoll Stoll Berne Lokting & Shlachter P.C.
        209 S. W. Oak Street, Fifth Floor
        Portland, Oregon  97204

        William O. Geny
        Chernoff Vilhauer McClung & Stenzel LLP
        601 S. W. 2nd Avenue, Suite 1600
        Portland, Oregon  97204

            Attorneys for Plaintiff

Page 1 - OPINION AND ORDER

James R. Farmer
Mark A. Miller
Brett L. Foster
L. Grant Foster
Timothy P. Getzoff
Holland & Hart LLP
60 E. South Temple, Suite 2000
Salt Lake City, Utah  84111-1031

Jeffrey S. Love
Ramon A. Klitzke, II
Richard D. McLeod
Klarquist Sparkman, LLP
One World Trade Center, Suite 1600
121 S. W. Salmon Street
Portland, Oregon  97204-2988

      Attorneys for Defendants Browning, Browning Arms Co., and U. S. Repeating
            Arms Co., Inc.

Robert E. Sabido
Cosgrave Vergeer Kester LLP
805 S. W. Broadway, 8th Floor
Portland, Oregon  97205-3303

Stephen D. Gay
Husch & Eppenberger, LLC
736 Georgia Avenue, Suite 300
Chattanooga, TN  37402

Dutro E. Campbell, II
Gregory E. Upchurch
Husch & Eppenberger, LLC
190 Carondelet Plaza, Suite 600
St. Louis, MO  63105

      Attorneys for Defendants Olin Corporation-Winchester Division and G. I. Joe's, Inc.

KING, Judge:

Plaintiff John R. Jamison claims to have invented, developed and patented several revolutionary types of hunting rifles and cartridge concepts. Plaintiff brings a claim for patent infringement against U.S. Repeating Arms Co., Inc., Browning, Browning Arms Co. (the "Browning defendants"), Olin Corporation-Winchester Division ("Olin"),[1] and G.I. Joe's, Inc. In addition, plaintiff brings a claim for misappropriation of trade secrets under the Oregon Uniform Trade Secrets Act against all defendants except G.I. Joe's, and claims for breach of express contract, breach of implied in fact contract, breach of implied covenant of good faith and fair dealing, tortious breach of duty of good faith and fair dealing, and intentional interference with economic relations against Olin. Finally, plaintiff brings a claim for breach of quasi-contract against all defendants except G.I. Joe's.

Before me is Olin's Motion for Summary Judgment on Counts 3 Through 8 (#328), addressing the latter six breach of contract claims set forth above, and the Browning Defendants' Motion for Partial Summary Judgment on Quasi-Contract Claim (#295). I grant in part and deny in part the Browning defendants' motion and grant in part and deny in part Olin's motion.

Finally, plaintiff filed a notice of voluntary dismissal without prejudice of counts 7 and 8 (tortious breach of duty of good faith and fair dealing, and intentional interference with economic relations). Having received no objection to the voluntary dismissal, I dismiss counts 7 and 8.

## BACKGROUND

Jamison is a firearms and ammunition journalist. Olin manufactures firearms ammunition. The Browning defendants manufacture, sell, distribute, and market firearms.

---

[1]At times Olin is referred to as Winchester in quotations of documents or depositions.

Plaintiff has an interest in wildcatting, which is the process through which gun enthusiasts modify existing ammunition cartridges for their own use. Plaintiff experimented with several wildcats with the goal of designing a short, fat cartridge with a magnum-type performance for use in a short-action rifle. His experimentation was successful, and he applied for patent protection in early 1997. From 1997 through 2004, he applied for and received a total of seven patents covering a range of cartridge and mating rifle chamber designs embodying his short, magnum concept, four of which form the basis of plaintiff's patent infringement claims in this lawsuit.

Plaintiff first contacted Sturm, Ruger & Company, Inc. ("Ruger"), a firearms manufacturer, about commercial development of the short, magnum cartridge and rifle concept in late 1995 or early 1996. Ruger expressed interest, and indicated that it would make the rifles if plaintiff could interest Olin in manufacturing the ammunition. The three parties met together at the industry "Shot Show" in January 1997. At the meeting, plaintiff agreed to send Olin ballistics data on his short, fat cartridge for Olin's evaluation of the project.

Plaintiff sent Olin the 62-page results of the testing he conducted between January 28 and February 17, 1997 on his short, fat cartridge.

On March 6, 1997, Olin and Ruger representatives met for the second time. At the meeting, the parties named the cartridge and rifle concept they would develop the "JRW," using the first initials of the names Jamison, Ruger and Winchester.

In a March 14, 1997 letter to Alan Corzine, Olin's Director of Product Creation, plaintiff wrote the following, in pertinent part:

> [R]egarding my cartridge design that we have been discussing, I do have a pending patent application and I think it is reasonable to expect some sort of a reasonable royalty payment whenever the ammunition is sold.

\* \* \*

I am in the process of negotiating an agreement with Mr. Ruger regarding the rifles.

Declaration of Jennifer A. Wagner in Support of Plaintiff's Opposition to Defendant Olin's Motion for Summary Judgment on Counts 3 Through 8 ("Wagner Dec."), Ex. 50.

Three Olin representatives subsequently met with plaintiff at his shop in April, 1997, and executed a document presented to them by plaintiff entitled "Acknowledgment of Confidentiality."

In an April 22, 1997 follow-up letter to Doug Cahill, President of Winchester, plaintiff wrote, in pertinent part:

> I am pleased about Winchester's introduction of the Jamison wildcat cartridges, soon to be called "JRW." . . . I think you will also be pleased by the acceptance of these high performance short action cartridges.
>
> Last March 14 [1997] I wrote to Allen Corzine regarding my pending patent application and wanting to discuss a reasonable royalty payment. I then mentioned this to Mike Jordan when he, Allen, and Glen Weeks were here a couple of weeks ago for a confidential review of my latest cartridge developments. Mike said that he would "get something penciled out" and then get back to me.

Wagner Dec., Ex. 30.

Ruger entered into a licensing agreement with plaintiff in early 1998. That licensing agreement contemplated the potential payment of royalties to plaintiff on the sale of rifles manufactured to accommodate a short, fat cartridge. The licensing agreement specifically contemplated that the cartridges might be manufactured by Olin but that they might be manufactured by someone else.

In contrast, plaintiff and Olin never agreed upon terms for compensation to plaintiff.

On September 11, 1998, in a letter to plaintiff, Olin stated, "We understand you have applied for a patent on this "cartridge concept" and you mentioned a desire to collect a royalty from those participating. Winchester's firm position will be to offer no royalty payments and further request an exclusive license to manufacture and sell any of the JRW cartridges, independent of the caliber under your patent if it issues." Exhibits to Declaration of Jennifer A. Wagner in Support of Plaintiff's Opposition to the Browning Defendants' Motion for Partial Summary Judgment on Quasi-Contract Claim, Ex. 10.

On October 5, 1998, Olin requested a royalty-free license on "JRW Cartridges of any desired caliber" and stated in a letter that Olin was "not prepared to go forward with commercialization of the JRW Cartridge concept" and would "terminate [the] development of the JRW Cartridges" unless plaintiff signed such an agreement by November 6, 1998. Wagner Dec., Ex. 54.

In a November 2, 1998 letter, plaintiff wrote:

I received a letter from you with a contract proposal and I am wondering if I am missing a page. The letter proposed what Winchester would like to receive from Jamison and said nothing about what Jamison would receive from Winchester.

I am certainly willing to talk about what it is you want, but I am not willing to give away the rights to what I think is a revolutionary cartridge concept–for nothing. Your proposal not only would give Winchester "the farm," so to speak, but it would preclude any other agreements I might have.

I have a lot of time and expense wrapped up in the experimentation around and development of the concept. It makes no sense for everyone involved to profit from it except the one who originated the idea and tested it.

Wagner Dec., Ex. 55.

Nevertheless, plaintiff and Olin eventually brought a new "JRW cartridge," known as the 300 JRW, to a point of substantial completion and scheduled a hunt in Texas on February 22, 1999 to introduce the cartridge to hunting sports writers. On the eve of the scheduled public announcement, in February 1999, plaintiff was expecting to receive a draft contract from Olin. Instead, Olin, through its attorney Corzine, faxed a letter to plaintiff on February 19, 1999, dated February 18, 1999, stating, in pertinent part:

> * * *
> The partnership has survived and we are now ready to introduce the first cartridge/gun combination, entitled the 300 JRW. Furthermore, significant groundwork has been established to enable future line extensions based on the short action concept.
> * * *
> We understand you have applied for a patent on the "short fat cartridge concept."
> * * *
> Winchester is not prepared to go forward with commercialization of the JRW concept defined as a standard short action non belted magnum cartridge, unless you are willing to grant to Winchester a royalty free, non-exclusive license, with the right to sublicense other interested firearm and cartridge manufacturers, to make, have made, use, offer for sale, sell and import JRW Cartridges of any desired caliber, most likely within the .22 to .45 caliber range. This will enable our introduction of these cartridges into SAAMI.
>
> Without your agreement to grant these rights, we will be forced to terminate the immediate cartridge introduction and all subsequent JRW cartridge developments.

Wagner Dec., Ex. 26 at 3.

Plaintiff's attorney, Jacob Vilhauer, responded, in pertinent part, on February 19, 1999:

> Mr. Jamison does not accept your proposal, and wishes future negotiations regarding a possible license, if any, to be conducted only through the undersigned. Any previous offers or discussion regarding the terms of a license are hereby withdrawn pending further negotiations culminating in a written agreement executed by Mr. Jamison.
>
> In view of Winchester's expressed intent to cancel the scheduled introduction, Mr. Jamison feels that it would be inappropriate for him to attend the hunt scheduled for Monday, February 22, in Texas.

Wagner Dec., Ex. 69.

Olin wished to go forward, and the attendees arrived at the hunt. When plaintiff did not arrive, Corzine called Vilhauer. Although the content of the conversation is disputed, according to Vilhauer, Corzine promised to fax confirmation that Olin would promise not to sell JRW-type cartridges until a written license agreement had been executed by plaintiff, and that in return plaintiff would not object to the introduction of the JRW cartridges and the hunt. Corzine testifies that Vilhauer was indeed talking about JRW-type cartridges, and not just the 300 JRW to be introduced at the hunt, but that the parties never reached an oral agreement of the sort described by Vilhauer.

Shortly after their conversation, Vilhauer faxed Corzine a letter containing his summary of the telephone conference. Ted Zimmerman, an Olin lawyer, faxed a letter responding to Vilhauer's fax, the meaning of which is in dispute.

Because the hunt had already begun by the time Vilhauer received this fax, Vilhauer understood that the letter was the promised written confirmation that Olin would not sell "JRW-type" cartridges in the absence of a written license agreement with plaintiff. Plaintiff did not object to the hunt. The writers were asked not to write about the cartridge.

Negotiations occurred after February 22, 1999, and were not limited to a particular short, magnum cartridge, but were unsuccessful. The JRW project was terminated as of December 23, 1999.

In September of 2000, Olin publicly announced its plans to market a short, fat cartridge with the Browning defendants, called the 300 WSM. Plaintiff protested Olin's plans in November, 2000. Olin further publicly introduced the 300 WSM in January or February 2001 at

the annual industry Shot Show and began regular sales of its WSM cartridge by at least March of 2001. Plaintiff asserts that the WSM and the related WSSM cartridges are JRW-type cartridges.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.     Fifth Claim for Relief:  Quasi-Contract Claim Against All Defendants

The Browning defendants and Olin contend that plaintiff's quasi-contract claim is preempted under the Oregon Uniform Trade Secrets Act ("OUTSA"). The OUTSA provides that the statute "supersedes conflicting tort, restitution or other laws of Oregon providing civil remedies for misappropriation of a trade secret," but does not affect "other civil remedies that are not based upon misappropriation of a trade secret." ORS 646.473 (1), (2)(b).

No Oregon state appellate court has interpreted the language. The District of Oregon has construed the language to preempt claims "[w]here the essence of the claim relates primarily to the alleged misappropriation of a trade secret . . . ." Acrymed, Inc. v. Convatec, 317 F. Supp.2d 1204, 1217 (D. Or. 2004).

In his Complaint, plaintiff alleges that he conferred a benefit on defendants by "bringing

the substantially developed short, fat cartridge and mating rifle concept" to Olin, and by

"providing his knowledge, skills, and services, including substantial time and expense" to Olin,

Olin thereafter shared that information with Browning, and the disclosure and use of that

information "formed the basis of" the "Winchester/Browning joint development project."

Consolidated Second Amended Complaint ("Complaint"), ¶¶ 50, 51.  Plaintiff now clarifies the

allegations in his Complaint, asserting that he seeks compensation for the value of his services

and the value of substantial materials, equipment, and facilities he contributed to the development

of the JRW cartridge.  In contrast, plaintiff contends, his trade secret claim seeks damages for

defendants' improper use of plaintiff's commercially valuable confidential information.

Plaintiff distinguishes <u>Acrymed, Inc.</u> by arguing that the complaint in that case claimed

that "Defendant[] derived a substantial benefit from the *information and knowledge conferred*

*upon it by AcryMed for the development, manufacture and sale of the [] product.*" <u>Acrymed, Inc.</u>,

317 F. Supp.2d at 1218 (emphasis added).  Plaintiff argues that Browning cannot cite any

authority that quasi-contract claims not seeking misappropriation of confidential information are

preempted by the OUTSA.

In addition, according to plaintiff, his quasi-contract claim incorporates facts unrelated to

the misappropriation of trade secrets.  For example, he asserts that the JRW cartridge was

essentially developed when Olin and he terminated the project, but that Olin quickly moved to

complete the project with the Browning defendants.  He asserts he worked almost full time on the

JRW project, utilizing his own materials, equipment, facilities and paid assistant, and made his

private facilities available to Olin employees.  Plaintiff communicated his desire for payment, but

he never received compensation for these contributions. According to plaintiff, the Browning defendants knew that he contributed to the joint development of the JRW, that he claimed ownership rights in the project, and that they replaced plaintiff on the project. According to plaintiff, these are not the same operative facts that support his trade secrets claim.

I find that in this case there is no meaningful difference between the trade secrets plaintiff alleges were misappropriated and the time he spent developing those trade secrets. By providing services to the JRW project, plaintiff was simply conferring knowledge and information on the project, and it is this knowledge and information that plaintiff asserts forms the basis of his trade secrets claim. See Complaint at ¶¶ 34, 35; Plaintiff's Combined Opposition to Defendants' Motions for Summary Judgment of No Trade Secret Misappropriation at 29 (claiming "know-how" a trade secret). Likewise, in Acrymed, Inc. it was this conferred information and knowledge that the court found, at its essence, formed the basis of a claim relating to the alleged misappropriation of trade secrets. Acrymed, Inc., 317 F. Supp.2d at 1217-18. Plaintiff has not established that he provided any services that were unrelated to his provision of trade secrets on the JRW project. I recognize that my conclusion requires plaintiff to choose between suing for the value of his labor or suing for the misappropriation of potential trade secrets created in his work. However, the OUTSA is written in such a way that plaintiff could obtain damages for the value of the trade secret as well as for the services he provided in obtaining the trade secret. See ORS 646.465.

On the other hand, I find there is a difference between the services plaintiff offered to the project and his provision of materials, equipment, and facilities. Materials, equipment, facilities and plaintiff's paid assistant are not trade secrets. They are not "information . . . that derives

independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." ORS 646.461(4). Indeed, at its essence, a demand for reimbursement for the use of materials, equipment, facilities, and a paid assistant is not a claim for misappropriation of trade secrets, and therefore, plaintiff's quasi-contract claim against defendants is not an attempt to obtain "civil remedies for misappropriation of a trade secret." ORS 646.473(1). Plaintiff's quasi-contract claim is accordingly limited to restitution for the use of materials, equipment, facilities, and his paid assistant.

Browning makes additional arguments as to the merits of the quasi-contract claim. These are arguments to which plaintiff has not had an opportunity to respond as they were set out in the Browning defendants' reply brief. Accordingly, I do not consider the merits of the quasi-contract claim.

II.     Third Claim for Relief:  Breach of Express Contract Against Olin

Plaintiff's breach of express contract claim alleges the breach of several separate contracts. Plaintiff asserts the parties entered into an oral contract on February 22, 1999 during the telephone conversation between Vilhauer and Corzine which allegedly "prohibited [Olin] from selling JRW-type cartridges unless and until a written license agreement was executed by Jamison." Complaint at ¶ 41. Alternatively, the parties entered into a written contract in the later exchange of letters. Second, plaintiff alleges that Olin disclosed or used information in violation of the express confidentiality agreement.

A.     Express Contract to Refrain from Selling JRW-Type Cartridge

The parties' divergent views on the existence of an oral contract are apparent in the participants' memory of the relevant telephone conversation. The telephone conversation occurred between plaintiff's counsel, Vilhauer, and Olin's Director of Product Creation, Corzine, the day plaintiff failed to appear in Texas for the introduction of the 300 JRW cartridge. The telephone conversation came subsequent to an exchange of faxed letters on February 19. Corzine had faxed a letter to plaintiff, dated February 18, 1999, in which he stated Olin was "not prepared to go forward with commercialization of the JRW concept defined as a standard short action non belted magnum cartridge, unless you are willing to grant to [Olin] a royalty free, non-exclusive license . . . ." Wagner Dec., Ex. 26 (set forth more fully in the Background section). Plaintiff, through his counsel Vilhauer, rejected this proposal and stated, "In view of [Olin's] expressed intent to cancel the scheduled introduction, Mr. Jamison feels that it would be inappropriate for him to attend the hunt scheduled for Monday, February 22, in Texas." Wagner Dec., Ex. 69 (set forth more fully in the Background section). The telephone conversation occurred the morning of February 22.

Corzine recalls the telephone conversation as follows:

Q: And what did you say to Mr. Vilhauer and what did he say to you?

A: The – I had a very short conversation with Mr. Vilhauer, asking him why Rick wasn't present on the hunt. He indicated to me that in order to – in order for Rick to attend the hunt, that I must agree that Winchester would not sell JRW-type cartridges without reaching a written license agreement with Mr. Jamison. I did not agree to do that. I indicated I was not in a position to do that at that point and could not confirm with that request.

Q: Anything--

A:  I then – I placed a call to our attorney, Ted Zimmermann at the time, to inform Ted of the pending situation and I had all of the others, other outdoor writers and representatives from our company, leave town for the hunt and I stayed back [at the airport in Texas] for a very short period of time waiting for some communication with Ted.

* * *

Q:  Okay.  And did you say anything to [Vilhauer] that you did not intend for the letter of February 18 to go to Mr. Jamison as written?

A:  No, I do not remember that.

Wagner Dec., Ex. 3, Corzine Depo. 117:23 - 118:17.

In comparison, Vilhauer recalls the conversation in this way:

Q:  All right.  Tell me what you recall as having been said in that telephone conversation between you and Mr. Corzine on February 22, 1999?  And let the record reflect that the witness has Exhibit 569 in front of him–excuse me, 564.

A:  I told Mr. Corzine that his letter delivered to Mr. Jamison late Friday made it impossible for Mr. Jamison to attend the hunt.  I told him Mr. Jamison was very upset about the letter and about the fact that he could not attend the hunt, both.

* * *

A: . . .  Mr. Corzine did then say, as my note indicates, that the wrong letter had gone to Mr. Jamison.  He did not intend for his letter of February 18 to go to Mr. Jamison and he explained he wasn't in the office on the date of that letter, which was the 18th.  He was on the West Coast.

He said that he knew that Jamison and Winchester had not reached any agreement as yet and that he would have Winchester's lawyer contact me shortly to – to talk about the possible agreement.

He then said something about not – not now knowing what to do about the hunt and I told him that Mr. Jamison does not want to embarrass him.  That's not [the] point here.  And, therefore, Mr. Jamison won't object to the – the introduction and the hunt if Winchester will agree – my note says not to sell any cartridges of this type until there is a written agreement between Jamison and Winchester.

He said he would fax me a letter to that effect.

Wagner Dec., Ex. 16, Vilhauer Depo. 273:10 - 274:21.

Vilhauer's contemporaneous notes (referred to as Exhibit 564 during Vilhauer's deposition) state:

Page 14 - OPINION AND ORDER

Corzine did not intend for his letter of Feb. 18 to go to Rick as written. He wasn't in the office on the 18th (he was on the West Coast).

He knows they haven't reached agreement yet, and will have his lawyer contact me.

I said Jam. won't object to introduction and hunt if Win. will agree not to sell until there is a written agreem. He'll fax me a ltr.

Wagner Dec., Ex. 71.

According to plaintiff, viewing the facts in the light most favorable to him, Corzine accepted Vilhauer's offer by promising that Olin would (1) resume license negotiations with plaintiff; (2) refrain from selling JRW-type cartridges until a written license agreement was executed; and (3) send Vilhauer a letter confirming the agreement. According to plaintiff, Corzine further manifested acceptance by proceeding with the hunt. At the time Corzine accepted, plaintiff then became obligated to allow the hunt to go forward, to refrain from objecting to the scheduled introduction of the 300 JRW, and to re-enter negotiations for the license.

Defendant argues that the oral conversation was merely a forerunner to the written exchange of letters.

Plaintiff did not move for summary judgment on this claim. Therefore, I need only determine whether there are material issues of fact precluding summary judgment in Olin's favor. I find that there are. Viewing the facts in the light most favorable to plaintiff, *if* Corzine said he would "fax a letter to that effect," a reasonable person could construe that statement as assenting to the demand that Olin refrain from selling JRW-type cartridges until the parties had come to an agreement on licensing, and accepting in return plaintiff's promise not to object to the

introduction or the hunt.  See Wooton v. Viking Distributing Co., 136 Or. App. 56, 59, 899 P.2d

1219 (1995).

As for the written exchange of correspondence, after hanging up with Corzine, Vilhauer

faxed the following letter to Corzine's office:

> This will confirm our telephone conference this morning.
>
> Mr. Jamison will not object to your public announcement, scheduled for today, of Winchester's intent to market JRW cartridges, nor to the hunt which you have scheduled to demonstrate the cartridges, on the condition that you first fax to me a brief letter agreeing that Winchester will not sell JRW-type cartridges until a written license agreement has been executed by Mr. Jamison.  You agreed that the terms of such license agreement are to be negotiated.  You indicated that you would fax to me the requested letter, and thereafter have Winchester's patent attorney contact me to commence negotiations regarding the license.

Wagner Dec., Ex. 70.

In response, Ted Zimmerman, an Olin lawyer, faxed a letter to Vilhauer:

> I just received the fax you sent Mr. Alan Corzine this afternoon and am replying on his behalf.  As you are obviously aware, he and a representative from Ruger are conducting a hunt that was supposed to be co-hosted by your client, Mr. Rick Jamison.  However, due to Mr. Jamison's "11th hour" withdrawal from activities, Mr. Corzine is now at the hunt, unreachable and undoubtedly with no idea that you have faxed him anything.  I have no idea whether your letter correctly confirms your phone conference with him, but at a minimum note that any commitments Mr. Corzine made in this regard were without the benefit of my counsel given the unfortunate position into which Mr. Jamison forced him.
>
> Regardless, in reply to your fax, I will confirm that Mr. Corzine will publicly announce the new cartridge at or after the hunt, with the understanding that no sales of such cartridge will be made until Mr. Jamison and Winchester come to a written understanding of each other's rights.

Wagner Dec., Ex. 72.

Where evidence of an alleged contract is contained in letters or other writings, the court

must construe them and see if they constitute a contract.  Wagner v. Ranier Manufacturing Co.,

230 Or. 531, 537, 371 P.2d 74 (1962). The acceptance must be "positive, unconditional, unequivocal and unambiguous, and must not change, add to, or qualify the terms of the offer." Id. at 538. The objective manifestation of acceptance to the offeror forms a contract. Gordon v. Curtis Bros. A.D. Moodie House-Moving Co., 119 Or. 55, 62-63, 248 P. 158 (1926) (en banc).

With respect to the February 22, 1999 exchange of letters, Olin argues there was no meeting of the minds. Vilhauer's letter contemplated a future event before any contract could be created–Olin's faxing a letter agreeing that Olin would not sell *JRW-type* cartridges until a written license agreement had been executed by plaintiff. Olin's letter did not mirror the language contained in Vilhauer's letter. Olin's letter only stated that it would not sell the "new cartridge" being announced at the hunt. The cartridge being introduced at the hunt was a JRW cartridge, and Olin has never sold any JRW cartridges.

Viewing the evidence in the light most favorable to plaintiff, the significance of the fact that Zimmerman, Olin's lawyer, did not repeat "JRW-type cartridges" using "new cartridge" and "such cartridge" instead is unclear. It is true that Zimmerman testified, "I don't think in my fax that I agreed with all the terms of his fax of February 22 earlier in the day." Exhibits to Concise Statement of Material Facts in Support of Defendant's Motion for Summary Judgment on Count 3 Through 8, Ex. JJ, Zimmerman Depo. at 79:14-15. However, it may have been reasonable for Vilhauer to understand "such cartridge" as referring to "JRW-type cartridges" because of his conversation earlier in the day with Corzine. Certainly Corzine remembers the subject of the conversation as being about "JRW-type cartridges." After all, Olin admits there was interest in a "JRW family" of cartridges.

Indeed, plaintiff points to a letter written by Zimmerman when plaintiff questioned Olin's sale of the WSM as being in violation of the February 22, 1999 agreement. Zimmerman wrote, "Whether [plaintiff] ever had a 'contract' with Winchester is arguable. I acknowledge that in my February 22, 1999 letter I stated 'no sales of such cartridge. . . .' Rest assured we have made no sales of a 300 JRW, or *any derivative product*." Wagner Dec., Ex. 110 (emphasis added).

Finally, plaintiff offers supplemental evidence on this issue from plaintiff's deposition of Paul Weinstein, Olin's former Deputy General Counsel and current legal consultant. During that deposition, Weinstein gave the following testimony:

Q: . . . [W]hen you read this letter from Mr. [Vilhauer], Exhibit 523, did you understand what he was asking from Winchester?

A: I thought I did.

Q: You thought you did?

A: I mean, I assume that I – I thought I did, yeah.

Q: Well, has something happened now that makes you think that you didn't understand or something?

A: No. Like I – I understood it as a letter saying that it was okay for us to go forward, and that we would negotiate an agreement.

Q: Okay for you to go forward, if based – if certain conditions were satisfied, correct; which were very explicit in this letter?

A: Yes.

Q: And did – is it your understanding that Olin-Winchester agreed to the conditions of this letter?

A: Yes.

Supplemental Evidence in Opposition to Olin's Motion for Summary Judgment Against Plaintiff's Breach of Contract Claims, Ex. 113.

Accordingly, I find there are material issues of fact as to the true content of the telephone conversation between Vilhauer and Corzine, Zimmerman's understanding of that conversation when crafting his faxed response, Vilhauer's reasonable understanding of Zimmerman's letter, and the parties' course of conduct as to their use of the term JRW cartridge. I deny Olin's motion for summary judgment.

3.      <u>Lack of consideration for the Express Contract</u>

Olin also argues any contract lacks consideration. Plaintiff only offered that he would "not object" to the hunt and to Olin's anticipated public announcement of the JRW cartridge. "Not objecting" to something is not consideration. According to Olin, while forbearance is consideration, the forbearance typically supporting a contract involves "forbearance to bring suit or forbearance to make use of some legal remedy." <u>Aldrich v. Forbes</u>, 237 Or. 559, 563, 385 P.2d 618 (Or. 1963) (en banc).

Plaintiff responds that courts do not inquire into the adequacy of consideration. <u>Biersdorf v. Putnam</u>, 181 Or. 522, 550, 182 P.2d 992 (1947). Plaintiff suffered a detriment and Olin obtained a benefit; as one of the developers of the JRW cartridge, plaintiff could have insisted that the hunt be cancelled, but he did not. According to plaintiff, Olin recognized at the time that either party had the right to cancel the hunt and insist on a license or similar agreement in order for the hunt to proceed. Recognizing that Olin needed to resolve the dispute before making any announcement, Corzine contacted plaintiff's lawyer in an attempt to reach an agreement.

Again, plaintiff has not moved for summary judgment on this issue. Accordingly, I must only determine whether there are any issues of fact precluding summary judgment. I find that if any contract was formed, there are material issues of fact as to whether valid consideration

supported such a contract.  Contrary to Olin's statement of the law, consideration may be based on the promisee's forbearance of some legal right to which he or she would have otherwise been entitled to exercise, not just forbearance from filing a law suit.  <u>Shelley v. Portland Tug & Barge Co.</u>, 158 Or. 377, 388, 76 P.2d 477 (1938); <u>McPhail v. Milwaukie Lumber Co.</u>, 165 Or. App. 596, 601, 999 P.2d 1144 (2000).  In his letter to plaintiff dated February 18, 1999, Corzine appeared to tie some agreement on royalties to the introduction of the JRW cartridge when he said, "we will be forced to terminate the immediate cartridge introduction and all subsequent JRW cartridge developments."  Wagner Dec., Ex. 26.  In this case, plaintiff may have suffered a detriment by forbearing his legal right to object to the hunt, and by allowing it to proceed without an agreement in place to protect him.

   B.  <u>Express Confidentiality Agreement</u>

  As for the "Acknowledgment of Confidentiality" signed in April 1997, plaintiff claims the 62-page packet of confidential ballistics data was confidential, and that Olin breached its contractual duty of confidentiality under the Acknowledgment, with respect to the ballistics data, when it began developing plaintiff's concept with Browning.

  Plaintiff has produced no evidence that Olin disclosed or used the non-public portions of the ballistics testing.  I grant Olin's motion for summary judgment with respect to plaintiff's claim for express breach of contract based on the confidentiality agreement.

III.  <u>Fourth Claim for Relief:  Breach of Implied Contract Against Olin</u>

  Plaintiff argues the existence of two implied in fact contracts.  He alleges that Olin had an implied in fact contractual obligation to refrain from selling cartridges embodying plaintiff's

concept without paying compensation to plaintiff, and an implied in fact obligation to maintain confidentiality with respect to JRW project information.

A contract may be express or implied. An implied in fact contract has the same legal effect as an express contract. <u>Staley v. Taylor</u>, 165 Or. App. 256, 262, 994 P.2d 1220 (2000). Unlike an express contract, in an implied in fact contract, the parties' agreement is inferred, in whole or in part, from their conduct. <u>Id.</u> "[A]n implied contract can arise only where the natural and just interpretation of the [acts of the] parties warrants such a conclusion." <u>Id.</u> at 262 n.6, citing <u>Owen v. Bradley</u>, 231 Or. 94, 103, 371 P.2d 966 (1962). A party may manifest its assent to an implied in fact contract over time through its course of conduct. <u>Montez v. Roloff Farms, Inc.</u>, 175 Or. App. 532, 536-37, 28 P.3d 1255 (2001).

A. <u>Implied in Fact Contract to Refrain from Selling JRW-Type Cartridge</u>

The sum of plaintiff's evidence is as follows. At the first meeting, plaintiff informed Olin that he expected compensation in the event Olin moved forward with commercialization. He subsequently informed Olin in writing on several occasions of his expectation for remuneration. A May 7, 1997 memo states that Olin's lawyers will "do a draft agreement with Jam[i]son" and that "whether or not we have a signed agreement will be part of the 'go-no-go' decision on the Jam[i]son round." Wagner Dec., Ex. 96. Plaintiff asserts that Olin for the first time rejected his request for royalties in October 1998,[2] by sending him a request for a royalty-free license, and by stating Olin was "not prepared to go forward with the commercialization of the JRW cartridge concept" and would "terminate [the] development of the JRW Cartridge" unless plaintiff signed

---

[2]Note, however, the September 11, 1998 letter from Corzine to plaintiff described in the Background section above. Wagner Dec. to Plaintiff's Opposition to Browning Motion, Ex. 10.

an agreement granting Olin a royalty-free license by November 6, 1998." Wagner Dec., Ex. 54. Plaintiff responded that he was not "willing to give away the rights to what [he thought was] a revolutionary cartridge concept–for nothing." Wagner Dec., Ex. 55. Olin sent a similar request for a royalty-free license to plaintiff in a letter dated February 18, 1999, set forth above. The telephone conference and exchange of letters between Olin and Vilhauer, also set forth above, confirmed plaintiff's refusal to grant a royalty-free license. Yet Olin proceeded with the introduction of the JRW cartridge at the hunt. After that introduction, the parties were never able to come to an agreement on the terms of plaintiff's compensation. Plaintiff asserts that the parties' course of conduct demonstrates that Olin understood it had an obligation to refrain from commercializing plaintiff's concept without compensating him.

Plaintiff relies on Kamin v. Kuhnau, 232 Or. 139, 148, 153, 374 P.2d 912 (1962), in which plaintiff hired defendant to implement improvements plaintiff had developed for garbage trucks. Defendant began manufacturing and selling trucks with similar improved features. Plaintiff sued, and the court recognized that "a manufacturer who has been employed to develop an inventor's ideas is not entitled to appropriate those ideas to his own use." Kamin, 232 Or. at 152.

Similarly, in Jaqua v. Nike, Inc., 125 Or. App. 294, 865 P.2d 442 (1993), plaintiff, as a clerk for defendant, disclosed a new type of shoe to defendant's vice president. The vice president encouraged plaintiff, even though plaintiff said he expected to be paid if defendant used his idea. After working on the shoe for two years, plaintiff terminated his employment with defendant. Defendant began marketing the shoe. The court found plaintiff's complaint alleged the existence of an implied in fact contract based on the "natural and just interpretation of the acts of the parties." Id. at 297.

Olin argues it is undisputed that negotiations were unsuccessful and the parties were unable to reach an agreement on plaintiff's compensation. Olin contends plaintiff cannot create an agreement through implication when the parties very specifically did not reach an agreement. Plaintiff requested compensation, but plaintiff never asserts that Olin agreed. Olin consistently rejected the idea.

Olin distinguishes Kamin and Jacqua. Kamin was not an implied in fact contract case; the court evaluated whether there had been a wrongful misappropriation of plaintiff's concept. Secondly, it was undisputed in that case that the parties had an agreement. Likewise, the Jacqua decision gave no indication that the parties before it had failed to reach an agreement. Furthermore, Jacqua was faced with a statute of limitations question. The sole issue was whether the complaint sounded in tort or contract to determine whether it was correctly dismissed.

Despite Olin's heroic efforts to limit Jacqua's applicability to the case at bar, it is apparent from this case that Oregon courts recognize that when a party accepts and uses another party's ideas, knowing that payment is expected, an implied in fact contract may exist. Jaqua, 125 Or. App. at 297 ("We conclude that defendant's conduct in using plaintiff's idea gives rise to an inference that it agreed to compensate him").

Accordingly, I review the conduct of the parties to determine whether an agreement may be inferred. Viewing the facts in the light most favorable to plaintiff, until September 1998, there is no evidence in the record of Olin's refusal to consider paying plaintiff a license fee or royalty.[3]

_____

[3]Although Olin asserts that industry standard is not to pay royalties on cartridges, and that Olin always indicated to plaintiff it would not pay a royalty, it provides no citation to the record in support of these statements. Memorandum of Law in Support of Defendant's Motion for Summary Judgment on Counts 3 Through 8, at 3.

Furthermore, plaintiff has provided undisputed evidence of his extensive work on the 300 JRW during 1997 and 1998. Likewise, viewing the evidence in the light most favorable to plaintiff, the telephone colloquy and exchange of letters between Vilhauer and Corzine in February 1999 indicate a recognition on the part of Olin that plaintiff expected compensation for his contributions, and Olin's conduct in continuing to accept plaintiff's services belies its repeated threats to cancel the project.

It remains unclear whether the parties intended to enter into a licensing agreement but could not agree upon a royalty, or whether there were disputes, at least on the part of Olin which it communicated to plaintiff, about the desirability of a license agreement in the first place. I am also curious about how much plaintiff contributed to the project after he received the September 1998 letter in which Olin shared its "firm position . . . to offer no royalty payments." Wagner Dec. to Plaintiff's Opposition to Browning Motion, Ex. 10. If plaintiff continued to provide his services in the face of Olin's refusal to enter into a licensing agreement, the parties can hardly be said to have come to a meeting of the minds. Furthermore, questions remain as to whether any implied in fact contract covered JRW-type cartridges. On the other hand, if both parties continued negotiations, but were unable to agree on a royalty, and Olin used plaintiff's ideas anyway, Olin may well have breached an implied in fact contract. Accordingly, I deny Olin's motion for summary judgment on this claim as there are remaining material issues of fact.

B.   Implied in Fact Confidentiality Agreement

With respect to the implied in fact confidentiality agreement, Olin argues that no implied in fact agreement can contravene the terms of an express contract. Uptown Heights Assoc. Limited Partnership v. Seafirst Corp., 320 Or. 638, 652, 891 P.2d 639 (1995) (en banc). Plaintiff

and Olin expressly agreed upon the scope of Olin's confidentiality obligations in the
Acknowledgment of Confidentiality completed by Olin employees.

Plaintiff responds that the parties owed each other the duty of confidentiality with respect
to "jointly developed JRW project information" and that Olin breached that duty when it "used
JRW project information in the development of the WSM." Plaintiff's Opposition to Defendant
Olin's Motion for Summary Judgment on Counts 3 Through 8, at 47, citing Montez, 175 Or. App.
at 536-37; Kamin, 232 Or. at 148, 152 (disclosure of confidential information which created a
commercial advantage was "sufficient to raise the implied agreement not to appropriate it").
Plaintiff asserts this implied in fact contract was separate from the express agreement in that it
covered different confidential information. Plaintiff offers no specifics about what he considers to
be "jointly developed JRW project information."

Plaintiff asks me to extend Kamin to apply to circumstances in which information *jointly
developed* gives rise to an implied in fact contract not to disclose that confidential information. I
decline to do so. Plaintiff offers no authority, and I can find none, providing that information
developed in a joint project warrants the same protection as information conveyed to another
under the implied condition that it remain confidential. Accordingly, I grant Olin's motion for
summary judgment on this portion of plaintiff's claim for breach of implied in fact contract.

IV.    Sixth Claim for Relief:  Breach of Implied Covenant of Good Faith and Fair Dealing
       Against Olin

Plaintiff alleges in his Complaint a claim for breach of the implied covenant of good faith
and fair dealing in both the express and implied in fact contracts analyzed above. Olin argues the
claim should be dismissed because there is no contract. Even if there were a contract, Olin argues

plaintiff has not met its burden of demonstrating the demands of any implied covenant accompanying the contract.

In every contract there is an implied duty of good faith and fair dealing that "is to be applied in a manner that will effectuate the [objectively] reasonable contractual expectation of the parties." Uptown Heights, 320 Or. at 645 (citation omitted).

If an express or implied contract exists, there is implied in that contract a duty of good faith and fair dealing. Accordingly, I deny Olin's motion for summary judgment.

V.    Summary

Due to remaining material issues of fact, Olin's Motion for Summary Judgment is denied with respect to its breach of any oral or written express contract, its breach of any implied in fact contract to refrain from selling JRW-type cartridges, and its violation of any implied duty of good faith and fair dealing. Both the Browning defendants' and Olin's Motions for Summary Judgment are denied on the quasi-contract claim with respect to materials, equipment and facilities, but are granted with respect to any services for which plaintiff claims restitution. Finally, Olin's Motion for Summary Judgment is granted with respect to plaintiff's claim for breach of the express confidentiality agreement and breach of the implied in fact confidentiality agreement.

///

///

///

## CONCLUSION

Browning Defendants' Motion for Partial Summary Judgment on Quasi-Contract Claim (#295) is granted in part and denied in part. Olin's Motion for Summary Judgment on Counts 3 Through 8 (#328) is granted in part and denied in part. In addition, I allow plaintiff to voluntarily dismiss without prejudice Counts 7 and 8 of plaintiff's Consolidated Second Amended Complaint (#418).

IT IS SO ORDERED.

Dated this _____28th_____ day of September, 2005.

                                     __/s/ Garr M. King_____
                                     Garr M. King
                                     United States District Judge