## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JOHN R. JAMISON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Case No. 03-1036-KI (lead case)** |
| **vs.** | ) **Case No. 04-31-KI** |
| | ) **Case No. 04-76-KI** |
| **OLIN CORPORATION-WINCHESTER** | ) |
| **DIVISION; U.S. REPEATING ARMS CO.,** | ) |
| **INC.; BROWNING; BROWNING ARMS** | ) |
| **CO.; and G.I. JOE'S Inc.,** | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

## REPORT AND RECOMMENDATION
## OF SPECIAL MASTER REGARDING
## SUMMARY JUDGMENT MOTIONS ON INFRINGEMENT

This case involves plaintiff's assertion of infringement of certain claims of four of his U.S. patents. The patents relate to firearms and firearm cartridges.

The Browning defendants (Browning, Browning Arms, and U.S. Repeating Arms; hereinafter "Browning") are accused of selling rifles that infringe the patents in suit. Defendant Olin is accused of selling infringing cartridges. G.I. Joe's is accused of selling both. Browning and Olin, but not G.I. Joe's, are also alleged to have committed torts other than patent infringement. Olin has apparently assumed the defense of G.I. Joe's with respect to the allegations of patent infringement; accordingly, they will be collectively referred to as "Olin."

In an order dated December 3, 2004, the Court appointed the undersigned as Special Master (SM) pursuant to Rule 53, FRCP. The specific purpose of the reference was to make recommendations to the Court regarding the construction of the claim terms

at issue. The Court and the parties contemplated that the SM would, in this connection, conduct a <u>Markman</u> hearing and issue a <u>Markman</u> report.[1] The Order also indicated that the SM might be asked to address other technical issues. Accordingly, the SM was "empowered to receive evidence and to conduct hearings on discovery issues, claims construction, summary judgment motions, and jury instructions, and to take any other necessary appropriate action for the efficient and just performance of his duties in accordance with Rule 53."

In an Order dated May 9, 2005, the Court referred the following summary judgment motions to the SM for report and recommendation:

 (1) Browning Defendants' Motion for Partial Summary Judgment of Invalidity Under 35 U.S.C. § 112;

(2) Browning Defendants' Motion for Partial Summary Judgment on Plaintiff's Induced Infringement Claim;

(3) Plaintiff's Motion for Partial Summary Judgment (Infringement);

(4) Browning Defendants' Motion for Partial Summary Judgment of Obviousness Under 35 U.S.C. § 103;

(5) Browning Defendants' Motion for Partial Summary Judgment of Anticipation Under 35 U.S.C. § 102;

(6) Browning Defendants' Motion for Partial Summary Judgment of Invalidity Under 35 U.S.C. § 102(f);

(7) Plaintiff's Motion for Partial Summary Judgment (Section 102 Defenses);

---

[1] See <u>Markman v. Westview Instr., Inc.,</u> 52 F.3d 967, 34 USPQ2d 1321 (Fed. Cir. 1995), aff'd 517 U.S. 370, 38 USPQ2d 1461 (1996). An Order Adopting Special Master's Claim Construction Report and Recommendation was entered March 3, 2005.

(8) Browning Defendants' Motion for Partial Summary Judgment on

  Plaintiff's Willful Infringement Claim;

(9) Browning Defendant's Motion for Partial Summary Judgment of No

  Trade Secret Misappropriation; and

(10) Defendant Olin Corporation-Winchester Division's Motion for

  Summary Judgment on Count 2 (Misappropriation of Trade

  Secrets).

This report addresses Motions Nos. 2, 3, and 8. In order to facilitate citations to the

various memoranda and statements of material facts submitted by the parties, the

following conventions are employed: P denotes plaintiff, O denotes Olin, and B denotes

Browning; the number following the party identification denotes the numbered motion

from the foregoing list; M denotes the moving party's initial brief or memorandum and

MS its initial statement of facts; A denotes the responding party's answering brief or

memorandum and AS its responsive statement of facts; and R denotes the moving party's

reply brief or memorandum and RS its reply statement of facts. For example, "P3M at 6"

refers to page 6 of plaintiff's initial brief in support of its motion for partial summary

judgment of infringement.

A draft of this report was provided to the parties on August 2, 2005, and a hearing

was held in Chicago, Illinois on October 3, 2005.

## THE MOTIONS

In Motion 3, plaintiff seeks a partial summary judgment of literal direct

infringement, under 35 U.S.C. §271(a), by both Olin and Browning, of certain claims of

the patents. The SM does not read plaintiff's motion as seeking a summary judgment of

infringement by inducement, under §271(b), or contributory infringement, under §271(c),

against any defendant.

In Motion 2, Browning seeks a partial summary judgment of no inducement of

infringement under §271(b). The SM does not read this motion as seeking a summary

judgment of no contributory infringement under §271(c). In Motion 8, Browning asks for

partial summary judgment as to plaintiff's claim that Browning's infringement was

willful.

## SUMMARY JUDGMENT FUNDAMENTALS

Summary judgment is as appropriate in a patent case as it is in any other case.  A

motion for summary judgment is properly granted only where the pleadings, depositions,

answers to interrogatories, and admissions on file, together with any affidavits, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law.  The party moving for summary judgment carries the burden

of demonstrating the absence of any genuine issue of material fact and its entitlement to

judgment as a matter of law.  In ruling on a motion for summary judgment, the district

court is required to view the evidence presented in a light most favorable to the

nonmoving party and to draw all reasonable inferences in favor of the nonmoving party.

However, the nonmoving party must do more than simply present some evidence as to an

issue it asserts is in dispute. Rather, the standard is that sufficient evidence must be

forthcoming such as would allow a reasonable jury to return a verdict in favor of the

nonmoving party.[2]

The inquiry involved in a ruling on a motion for summary judgment necessarily

implicates the substantive evidentiary standard of proof that would apply at the trial on

---

[2] E.g., C.R. Bard Inc. v. Advanced Card. Sys. Inc., 911 F.2d 670, 15 USPQ2d 1540, 1542 (Fed. Cir. 1990).

the merits.[3] Infringement, literal or by equivalents, requires proof by a preponderance of

the evidence.[4] Though literal infringement of a properly interpreted claim is a fact

question, its determination may be rendered clearly erroneous through an improper

interpretation and application of the governing law.[5]

Early on, the Federal Circuit expressed itself quite clearly on the subject of

summary judgment as it relates to the issue of infringement:

> It is at least conceivable that comparison of a properly interpreted claim
> with a stipulated or uncontested description of an accused device or
> process would reflect such an absence of material fact issue as to warrant
> summary judgment of infringement or noninfringement.  Because
> infringement is itself a fact issue, however, a motion for summary
> judgment of infringement or noninfringement should be approached with a
> care proportioned to the likelihood of its being inappropriate.[6]

Both sides are faced with essentially the same ultimate burden in seeking a

summary judgment with respect to infringement. As the Federal Circuit sees it, "[a]n

infringement issue is properly decided upon summary judgment when no reasonable jury

could find that every limitation recited in the properly construed claim either is or is not

found in the accused device either literally or under the doctrine of equivalents."[7]

Plaintiff, as the patent owner, has the burden of going forward, and the ultimate burden of

persuasion by a preponderance, on the issue of infringement. Under modern summary

judgment law, a patentee who fails to provide probative evidence of infringement runs the

risk of being peremptorily nonsuited. Evidence from which a reasonable fact-finder could

find infringement will forestall this possibility. However, a party does not meet this

evidentiary threshold merely by submitting the affidavit of an expert who opines that the

[3] E.g., Baker Oil Tools, Inc. v. Geo Vann, Inc., 828 F.2d 1588, 4 USPQ2d 1210, 1215 (Fed. Cir. 1987).
[4] E.g., Lemelson v. United States, 752 F.2d 1538, 224 USPQ 526, 531 (Fed. Cir. 1985).
[5] Amstar Corp. v. Envirotech Corp., 730 F.2d 1476, 221 USPQ 649, 653 (Fed. Cir. 1984).
[6] D.M.I. Inc. v. Deere & Co., 755 F.2d 1570, 225 USPQ 236, 238 (Fed. Cir. 1985).
[7] Gart v. Logitech Inc., 254 F.3d 1334, 59 USPQ2d 1290, 1293 (Fed. Cir. 2001).

accused device meets the claim limitations.[8] In the summary judgment context, the expert must set forth the factual foundation for his or her opinion – such as a statement regarding the structure found in the accused product – in sufficient detail for the court to determine whether that factual foundation would support a finding of infringement under the claim construction adopted by the court, with all reasonable inferences drawn in favor of the nonmovant.[9]

To avoid summary judgment of infringement, defendants here are required merely to point to an evidentiary conflict created on the record,[10] although general assertions of fact issues, general denials, and conclusory statements are insufficient to shoulder a non-movant's burden.[11] Of course, defendants' evidence is to be believed and all justifiable inferences are to be drawn in their favor.[12]

## SUMMARY OF INFRINGEMENT CONTENTIONS

Olin makes and sells WSM and WSSM cartridges. Browning makes and sells A-Bolt, BLR, and Model 70 rifles chambered for WSM and WSSM cartridges. G.I. Joe's sells those rifles and cartridges.

Plaintiff says that his '138 patent is infringed by the WSM cartridges and his '717 patent by the WSSM cartridges. He says that Browning rifles chambered for WSM cartridges infringe his '174 patent, and those chambered for WSSM infringe his '983 patent. His specific, claim-by-claim contentions, as set forth in Plaintiff's Infringement Contentions as amended (PIC), are complex, but may be summarized as follows:

## Direct Literal Infringement Under 35 U.S.C. 271(a)

---

[8] Novartis Corp. v. Ben Venue Labs. Inc., 271 F.3d 1043, 60 USPQ2d 1836, 1841-42 (Fed. Cir. 2001).
[9] Arthur A. Collins Inc. v. Northern Telecom Ltd., 216 F.3d 1042, 55 USPQ2d 1143, 1147 (Fed. Cir. 2000).
[10] Armco Inc. v. Cyclops Corp., 791 F.2d 147, 229 USPQ 721, 722 (Fed. Cir. 1986).
[11] Chemical Eng'g Corp. v. Essef Indus. Inc., 795 F.2d 1565, 230 USPQ 385, 390 (Fed. Cir. 1986).
[12] Monsanto Co. v. Bayer Bioscience N.V., 363 F.3d 1235, 70 USPQ2d 1257, 1261 (Fed. Cir. 2004).

- Factory-loaded 270 WSM, 7mm WSM, and 300 WSM cartridges literally infringe each of claims 1-4, 9-14, and 19 of the '138 patent. (PIC at 2)

- Factory-loaded 223 WSSM, 243 WSSM, and 25 WSSM cartridges literally infringe each of claims 1-2, 5-13, and 16-20 of the '717 patent. Factory-loaded 25 WSSM cartridges also literally infringe each of claims 3 and 14 of the '717 patent. (PIC at 4)

- All A-Bolt and BLR rifles chambered for WSM Cartridges infringe claims 1-4, 18 and 30 of the '174 patent, and all Model 70 rifles chambered for WSM cartridges infringe claims 1-4, 18 and 30-31 of the '174 patent. (PIC at 6)

- All A-Bolt rifles chambered for WSSM cartridges infringe claims 1-2, 3 (25 WSSM only), 5-8, 10, 12-13, 14 (25 WSSM only), 16-18 and 20 of the '983 patent. All Model 70 rifles chambered for WSSM cartridges infringe claims 1-2, 3 (25 WSSM only), 5-8, 10-13, 14 (25 WSSM only), 16-18 and 20-21 of the '983 patent. (PIC at 6)

Thus, plaintiff charges that Olin directly infringes the '138 and '717 patents by making, selling, and offering to sell its WSM and WSSM cartridges; that Browning directly infringes the '174 and '983 patents by making, selling, and offering to sell its A-Bolt, BLR, and Model 70 rifles chambered for WSM and WSSM cartridges; and that G.I. Joe's directly infringes all four patents by selling and offering to sell those rifles and cartridges.

## Inducement of Infringement Under 35 U.S.C. 271(b)

- By offering to sell and selling WSM and WSSM cartridges, Olin induces others to infringe the '174 and '983 firearm patents by purchasing and

using firearms chambered for those cartridges. By those acts, Olin induces

infringement, by Browning and others, of claims 1-4, 9-13, 18-19 and 30-

31 of the '174 patent and claims 1-3, 5-14 and 16-21 of the '983 patent.

(PIC at 11)

- Olin makes, offers to sell and sells unprimed, empty WSM and WSSM

  shellcases. The act of loading the shellcases in accordance with Olin's

  instructions results in a complete cartridge which directly infringes the

  '138 and '717 patents. By these acts, Olin induces infringement of claims

  1-4, 9-14, and 19 of the '138 patent and claims 1-2, 3 (25 WSSM only), 4-

  13, 14 (25 WSSM only), and 16-20 of the '717 patent. (PIC at 10)

- Olin publishes information intending that it be used by others to make, sell

  and offer to sell WSM and WSSM cartridges and firearms chambered for

  those cartridges. As a result, other firearm and ammunition manufacturers

  in fact make, offer to sell and sell WSSM and WSM cartridges and

  firearms. By these acts, Olin induces other firearm and ammunition

  manufacturers to infringe claims 1-4, 9-14, and 19 of the '138 patent,

  claims 1-3, 5-14 and 16-20 of the '717 patent, claims 1-4 and 30-31 of the

  '174 patent, and claims 1-3, 5-8, 10-14, 16-18 and 20-21 of the '983

  patent. (PIC at 10)

- The Browning Defendants intend that WSM or WSSM cartridges be used

  in their firearms. By offering to sell and selling infringing firearms

  chambered for infringing WSM or WSSM cartridges, Browning induces

  others to infringe claims 1-4, 9-14 and 19 of the '138 patent, claims 1-2, 3

  (25 WSSM only), 5-13, 14 (25 WSSM only) and 16-20 of the '717 patent,

claims 9-13 and 19 of the '174 patent, and claims 9 and 19 of the '983

patent by purchasing and using WSM and WSSM cartridges.[13] (PIC at 15)

- By offering to sell and selling infringing firearms chambered for infringing

  WSM or WSSM cartridges, Browning induces Olin to infringe claims 1-4,

  9-14, and 19 of the '138 patent and claims 1-3, 5-14 and 16-20 of the '717

  patent by making, selling, and offering to sell those cartridges. (PIC at 16)

- Browning publishes information intending that it be used by others to

  make, sell and offer to sell WSM and WSSM cartridges and firearms

  chambered for those cartridges.  As a result, other firearm and ammunition

  manufacturers in fact make, offer to sell and sell WSSM and WSM

  cartridges and firearms. By these acts, Browning induces other firearm and

  ammunition manufacturers to infringe claims 1-4, 9-14, and 19 of the '138

  patent, claims 1-3, 5-14 and 16-20 of the '717 patent, claims 1-4 and 30-

  31 of the '174 patent, and claims 1-3, 5-8, 10-14, 16-18 and 20-21 of the

  '983 patent.

The contentions regarding Olin's alleged inducement of infringement are not called into

play by any of these motions.

## Contributory Infringement Under 35 U.S.C. 271(c)

- Olin knows that its WSM and WSSM cartridges have no practical use

  other than in combination with firearms chambered for those cartridges.

  When used in combination, the cartridges and firearms directly infringe

  claims 9-13, 19, 30, and 31 of the '174 patent and claims 9 and 19 of the

---

[13] The inclusion of the firearms patents in this charge is explained by the fact that claims 9-13 and 19 of the '174 patent and claims 9 and 19 of the '983 patent are drawn to a combination of a firearm and a cartridge in its chamber. Thus, plaintiff apparently charges that Browning induces ultimate users of its accused firearms to infringe those claims by placing a cartridge in the chamber.

'983 patent. By selling and offering to sell WSM and WSSM cartridges,

Olin contributes to infringement of claims 9-13, 19, 30 and 31 of the '174

patent and claims 9 and 19 of the '983 patent, which claim a combination

of firearm and cartridge. (PIC at 11-12)

- Browning knows that its WSM and WSSM firearms have no practical use

    other than in combination with WSM or WSSM Cartridges.  When used in

    combination, the cartridges and firearms directly infringe claims 9-13, 19,

    30 and 31 of the '174 patent and claims 9 and 19 of the '983 patent. By

    selling and offering to sell those firearms, Browning contributes to

    infringement of claims 9-13, 19, 30, and 31 of the '174 patent and claims 9

    and 19 of the '983 patent, which claim a combination of firearm and

    cartridge. (PIC at 17)

The contentions regarding alleged contributory infringement are not called into play by

any of these motions.


## **DIRECT LITERAL INFRINGEMENT (Motion 3)**

## **Summary of Issues**

As indicated above, Olin makes and sells only cartridges, while Browning makes

and sells only rifles. Strictly speaking, therefore, Olin would be liable for direct

infringement of the rifle patents only if it be established that Olin is guilty of inducement

of infringement of those patents; by the same token, Browning would be liable for direct

infringement of the cartridge patents only if it be established that Browning is guilty of

inducement of infringement of those patents. Nonetheless, it will greatly facilitate this discussion of direct infringement simply to assume, for purposes of this discussion only, that each of them would be liable for any direct infringement of both sets of patents. Also, inasmuch as the rifle patent claims are largely rifle analogs of the cartridge patent claims, it will usually be sufficient simply to regard the cartridges as the accused infringing products, again for purposes of this discussion only.

With one exception, the defensive positions of Olin and Browning appear to coincide:

- Both Olin and Browning contend that the Court's claim construction should be revisited and reconsidered, to construe the limitation "capable of withstanding said internal gas pressure of at least 50,000 psi when in said chamber" (e.g., '138 patent claim 1) to mean that the accused cartridges would have to pass the so-called "slot test."[14] They further contend that plaintiff has not shown, and cannot show, that the accused cartridges can pass the slot test. Inasmuch as all of the asserted claims of the four patents contain the 50,000 psi limitation in words or substance, there is no literal infringement of any claim.

- Both Olin and Browning contend that the accused cartridges, when fired at pressures of at least 50,000 psi, experience some permanent deformation in the extractor groove. As a result, the cartridges do not literally infringe claims 11 and 20 of the '717 patent, claims 1-4, 9 and 10 of the '138 patent, and claims 10-13 of the '174 patent, all of which recite the "without permanent deformation" limitation.

---

[14] This contention was expressly rejected in the Markman Report (at pp. 30-32) which was adopted by the Court by its order of March 3, 2005.

- Both Olin and Browning contend that the accused cartridges do not meet limitation that the rim has an outer diameter "substantially no less than" the outer diameter of the case measured at a particular location along the case. As a result, the cartridges do not literally infringe claims 10 and 19 of the '138 patent, claims 18 and 30 of the '174 patent, and claims 10 and 20 of the '983 patent.

- Olin also contends that the term "annular rim" is defined in the patents as an "unrebated" rim.[15] Olin concedes that "annular rim" is a broader term than "unrebated," but contends that the patents narrow the commonly understood meaning of "annular rim." Olin says that the accused cartridges have a rebated rim and therefore do not literally infringe the asserted claims of the '138 and '717 cartridge patents, all of which call for an annular rim. The firearm patents do not contain this limitation.

## The "Without Permanent Deformation" Limitation

As indicated, claims 11 and 20 of the '717 patent and claims 1-4, 9 and 10 of the '138 patent require, in words or substance, that the cartridge be capable of withstanding an internal gas pressure of at least 50,000 psi without "permanent deformation" of the extractor groove longitudinally of the case.

---

[15] Judging from Browning's Technology Tutorial Brief (pp. 3-5), a real potential for confusion exists regarding the term "rim" itself. As best the SM has been able to gather, the industry apparently recognizes five major center-fire cartridge types: rimless, rimmed, rebated, semi-rimmed, and belted. Strangely enough, despite this nomenclature, all apparently have rims. The most common – rimless – has an extractor groove forward of the rim; the rim has a diameter about equal to the body of the cartridge. Rimmed cartridges have no extractor groove, and the rim diameter is greater than that of the body. Belted cartridges are similar to rimless, but include a radial belt forward of the extractor groove. Semi-rimmed cartridges have an extractor groove and the rim diameter is slightly greater than that of the body. Rebated rim cartridges have an extractor groove and the rim diameter is smaller than that of the body. The confusing aspect, of course, is that "rimless" cartridges indeed have rims.

Defendants' evidence on this issue is scant and sketchy. Their expert Dobler says only that, in his opinion, "virtually every modern rimless cartridge, at some point over 50,000 psi, will experience some permanent alteration of form or shape of the extractor groove after firing." (Dobler Report at 24) Dobler does not report on any measurements he or anybody else made to support this opinion. Moreover, his qualification of "some point over 50,000 psi" really begs the question of whether a particular cartridge could withstand "at least 50,000 psi" without permanent groove deformation. Another witness, Glen Weeks, testified that he had never done any testing to measure changes to the width of the extractor groove of a 300 WSM cartridge after firing. In testifying about a response to a request for admission that stated that there would be "some movement" of the extractor groove after firing a 270 WSM cartridge at a pressure of at least 50,000 psi, Weeks said that this "movement" would be "permanent deformation of the material," even though he admitted that he had never tested it to see how much it would move. (Weeks dep. at 397-99)

Plaintiff's evidence is a little more rigorous, but still not without potential problems. Plaintiff's expert Janzen, in a declaration (Exhibit 14) filed in support of its motion, says that he test fired three randomly-selected samples of each of the accused WSM and WSSM cartridges at 50,000 psi or better, and found that the "extractor grooves of these cartridges did not permanently deform when measured in the direction of the axis of the cartridge." He refers to his expert report for detailed test procedures. Browning vigorously attacks Janzen's test procedures (see B3A at 14-19; B3AS ¶¶ 9-12;), and also says that Janzen's conclusions contradict testing that plaintiff himself did and reported to the PTO during prosecution of he '138 patent (see B3A at 14-15; B3AS Exhibits C and D).

The current state of the record convinces the SM that genuine issues of material fact exist concerning whether the accused cartridges can withstand firing at internal pressures of at least 50,000 psi "without permanent deformation" of the extractor groove in a longitudinal direction. **Accordingly, it is recommended that plaintiff's motion be denied to the extent it seeks a summary judgment of literal direct infringement of claims 11 and 20 of the '717 patent, claims 1-4, 9 and 10 of the '138 patent.**

### The "Substantially No Less Than" Limitation

Claims 10 and 19 of the '138 patent, claims 18 and 30 of the '174 patent, claims 10 and 19 of the '717 patent, and claims 10 and 20 of the '983 patent all contain the limitation that the rim has an outer diameter "substantially no less than" the outer diameter of the case measured at a particular location along the case. During the Markman phase, the defendants argued that this limitation should be construed to require an "unrebated" rim. This contention was expressly rejected, largely on the ground that "[t]he SM foresees the potential for endless expert debate on what is, and is not, a 'rebated' cartridge rim." (Markman Report at 40) Olin essentially repeats that argument here in response to plaintiff's summary judgment motion. (See O3A at 14, 18) The SM sees no reason to revisit the claim construction adopted by the Court.

In concluding that the term "substantially no less than" needed no construction, the SM commented that:

> It is instructive to see what the Federal Circuit has had to say about the word "substantially" in the context of patent claims. Thus, the term "substantial" is a meaningful modifier implying "approximate," rather than "perfect."[16] Indeed, words of approximation, such as "generally" and "substantially," are descriptive terms commonly used in patent claims to avoid a strict numerical boundary to the specified parameter. Terms such as "approach each other," "close to," "substantially equal," and "closely

---

[16] Liquid Dyn. Corp. v. Vaughan Co., 355 F.3d 1361, 69 USPQ2d 1595, 1600 (Fed. Cir. 2004).

approximate" are ubiquitously used in patent claims and such usages, when serving reasonably to describe the claimed subject matter to those of skill in the field of the invention and to distinguish the claimed subject matter from the prior art, have been accepted in patent examination and upheld by the courts. While ideally all terms in a disputed claim would be definitively bounded and clear, such is rarely the case in the art of claim drafting.[17]

These decisions make it clear that the Federal Circuit is not inclined to place any specific limit on the term "substantially" in the absence of a clear disclaimer, either in the patent or its prosecution history. No such disclaimer is present here. Whether or not "unrebated" is a more specific term in the eyes of one skilled in this art is quite beside the point. Such persons are perfectly capable of evaluating the scope of the term "substantially no less" in light of the teaching of the patents.[18] * * * (Markman Report at 41; footnotes retained)

Those observations remain pertinent with respect to this motion for summary judgment. Plaintiff's expert Janzen reports that the rim diameter of the accused WSSM cartridges is 0.009 inches less than the case diameter at the specified location, and that of the accused WSM cartridges is 0.008 inches less. From this he concludes that "the rim diameter of the WSSM and WSM cartridges is substantially no less than the case diameter at the specified point." (Janzen Report at 10-11) Defendants, or at least Browning, hotly contest this conclusion, albeit without benefit of evidence, pointing out simply that the accused rim diameters are indeed less than the case diameters. Although defendants have no direct counter to Janzen's conclusion, the SM would not be comfortable in concluding that there is no genuine issue of material fact concerning whether 8 or 9 thousandths of an inch is or is not "substantially no less than" within the meaning of the claims. Janzen has not yet

---

[17] Anchor Wall Sys. Inc. v. Rockwood Ret. Walls Inc., 340 F.3d 1298, 67 USPQ2d 1865, 1873-74 (Fed. Cir. 2003).

[18] As Olin points out, there may well be practical constraints: "If 'substantially' were to encompass differences as large as 0.033 inches, as Plaintiff argues, then a cartridge placed into a chamber having 'substantially mating proportions' would either not fit correctly into the chamber (if some of the 'substantially mating proportions' of the cartridge were 0.033 inches too large), or would be so loosely fitting as not to be properly supported by the walls of the chamber (if some of the 'substantially mating proportions' of the cartridge were 0.033 inches too small). (OM3 at 7) It is questions like these that litter the battleground of expert witnesses at trial, but they are factual questions of infringement, not legal questions of claim construction.

been deposed to probe the basis for his conclusion and defendants' experts have not yet filed rebuttal reports. The jury should have the opportunity to observe the experts' demeanor, and weigh their respective qualifications and persuasiveness in resolving this factual issue. **Accordingly, it is recommended that plaintiff's motion be denied to the extent it seeks a summary judgment of literal direct infringement of claims 10 and 19 of the '138 patent, claims 18 and 30 of the '174 patent, claims 10 and 19 of the '717 patent, and claims 10 and 20 of the '983 patent.**

## The "Annular Rim" Limitation

Olin also contends that the limitation "annular rim," which appears in all the asserted claims of the '138 and '717 cartridge patents, requires that the rim be "unrebated." The preferred embodiment described in the patents includes a rim having an outer diameter "substantially no less than the outer case diameter" at a particular location along the case. Such a rim is characterized as "wide, or unrebated." (E.g., '138 patent, C7L33-47) Although Olin argued during the <u>Markman</u> phase that the "substantially no less than" limitation required an unrebated rim, it never argued that the term "annular rim" should be so construed. If it had so argued, the SM would have recommended that the Court reject such a construction.

And this for good reason: It is a cardinal rule of claim construction that the claims are not to be limited to the preferred embodiment described in the specification.[19] Thus the term "annular rim' is presumed to have its ordinary and customary meaning. That presumption is rebutted only if plaintiff, acting as his own lexicographer, has clearly set

---

[19] See, e.g., <u>SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys. Inc.</u>, 242 F.3d 1337, 58 USPQ2d 1059, 1062 (Fed. Cir. 2001). See also <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 75 USPQ2d 1321, 1331-32, 1334 (Fed. Cir. 2005). It is not true that where only one embodiment is disclosed in the specification, claim terms are limited to the embodiment disclosed. The number of embodiments disclosed in the specification is not determinative of the meaning of disputed claim terms. <u>Teleflex Inc. v. Ficosa North Am. Corp.</u>, 299 F.3d 1313, 63 USPQ2d 1374, 1381-82 (Fed. Cir. 2002).

forth a definition of "annular rim" that is different from the term's ordinary and customary meaning, or if he has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of anything other than an unrebated rim.[20] Neither of those conditions is present here. There is no express disclaimer of rebated rims, nor an express definitional equation of "annular rims" with "unrebated rim."

Accordingly, Olin cannot escape infringement by insisting that the term "annular rim" requires that the rim be unrebated.

## The "Slot Test" Controversy

Defendants essentially seek a revision of the Court's claim construction, to provide that the limitation – present in words or substance in all the asserted claims – that the cartridge be "capable of withstanding said internal gas pressure of at least 50,000 psi when in said chamber," be viewed as a requirement that the cartridge pass the so-called "slot test." (See B3A at 5-13; O3A at 13-14, 17) The "slot-test" controversy was considered in detail during the Markman phase and defendants' proposed construction was expressly rejected. (Markman Report at 32) Browning, however, says that it has "new evidence" that would justify a reconsideration and alteration of the Court's claim construction in this respect.

The new evidence proffered by Browning has to do with the results of testing undertaken by its expert Dobler, who attempted to duplicate plaintiff's slot tests with a .300 Jamison barrel. Dobler says that every .300 Jamison cartridge failed the slot test. (B3A at 8-9) There are three serious defects in Browning's position concerning this new evidence. The first is the simple fact that it is "new." It is not seen how testing conducted

---

[20] See, e.g., Intellectual Prop. Dev. Inc. v. UA-Columbia Cablevision, 336 F.3d 1308, 67 USPQ2d 1385, 1390 (Fed. Cir. 2003).

by an expert, long after the patent issued, can have any bearing on how the claims are to be interpreted as of the patent issue date. As the Federal Circuit has cautioned, "[w]hen a patent is granted, prosecution is concluded, the intrinsic record is fixed, and the public is placed on notice of its allowed claims."[21] Sitting en banc, that court recently confirmed that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."[22] Defendants do not explain how a person of ordinary skill in the art, seeking the meaning of claim language as of the issue date of the patent, could take into account the results of private testing that took place long after issuance. The second is the fact that the new Dobler testing is extrinsic evidence of the type that the courts do not generally favor. As the Federal Circuit taught in its watershed <u>Vitronics</u> case,[23]

> competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. * * * Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless. * * * The same holds true whether it is the patentee or the alleged infringer who seeks to alter the scope of the claims.
> * * * *
> [A]s we have recently re-emphasized, extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language.

Here, the proffered evidence of Dobler's testing does nothing to assist the Court in understanding the claims. Rather, it is used only as support for an undisguised

---

[21] <u>Texas Digital Sys. Inc. v. Telegenix Inc.</u>, 308 F.3d 1193, 64 USPQ2d 1812, 1818 (Fed. Cir. 2002).
[22] <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 75 USPQ2d 1321, 1326 (Fed. Cir. 2005).
[23] <u>Vitronics Corp. v. Conceptronic Inc.</u>, 90 F.3d 1576, 39 USPQ2d 1573, 1577-78 (Fed. Cir. 1996).

effort to get the Court to import a wholly extraneous claim limitation – passing the "slot test" – into the claims.

Finally, Browning's argument makes no sense. As explained in the Markman phase (Markman Report at 30-32), plaintiff advanced the slot test during prosecution of the '221 patent, which is not in suit here. The claims being prosecuted there did not – unlike the asserted claims of the patents in suit – include the limitation "when in said chamber." The slot test was therefore irrelevant to the construction of the claims of the patents in suit, and has no impact on those patents. The fact (as asserted by Dobler) that plaintiff's own cartridges cannot pass the slot test is likewise irrelevant to the construction of the claims of the patents in suit. Whatever impact the Dobler testing may have on the validity and enforceability of the '221 patent (a matter about which the SM expresses no opinion), it has no impact on the proper construction of the claims of the patents in suit.[24] Accordingly, defendants cannot escape infringement by insisting that the accused cartridge pass the so-called "slot test."

**New Evidence as to the 50,000 psi Limitation**

In addition to the slot test controversy, a new issue arose at oral argument regarding certain evidence that defendants say makes their previous admissions as to the 50,000 psi limitation inoperative. Defendants in their briefs did not directly

---

[24] Indeed, Browning's logic appears to be faulty. It is saying, in essence, that the claims should be interpreted to include a requirement (passing the slot test) that the preferred embodiment disclosed in the patents in suit cannot satisfy. This approach has been roundly criticized by the Federal Circuit: A claim construction that would exclude the preferred embodiment described in the specification "cannot be sustained." Burke Inc. v. Bruno Indep. Living Aids Inc., 183 F.3d 1334, 51 USPQ2d 1295, 1300 (Fed. Cir. 1999). The fact that a particular construction "would have the effect of placing all the embodiments of the invention outside the scope of the claims is powerful evidence that the construction is incorrect." Nellcor Puritan Bennett Inc. v. Masimo Corp., 402 F.3d 1364, 74 USPQ2d 1351, 1355 (Fed. Cir. 2005). "[I]t is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way." Hoechst Celanese Corp. v. BP Chem. Ltd., 78 F.3d 1575, 38 USPQ2d 1126, 1130 (Fed. Cir. 1996).

contest either the "sufficient propellant" or "capable of operably withstanding 50,000 psi" limitations. Rather, as to the latter limitation, as indicated above, they reargued the matter of the so-called "slot test." Indeed, they had already conceded that, under the Court's claim construction (which did not adopt a requirement that a cartridge pass the slot test), the 50,000 psi limitation was met in the accused products. Browning explicitly conceded that, under the Court's construction, the accused products satisfy the "capable of operably withstanding 50,000 psi limitation." (B3AS at 5) Olin's only objection to plaintiff's concise statement of uncontested facts (P3MS) in this connection was to assert that the accused cartridges could not pass the slot test. (O3AS at 2-3, 5-6) Olin admitted that all WSM and WSSM cartridges are loaded with sufficient propellant to fire at a peak pressure of at least 50,000 psi (PX 11 ¶¶2, 30, 58, 179, 233, 260) and that all WSM cartridges are capable of operably withstanding 50,000 psi under the Court's claim construction (PX 11 ¶¶3, 31, 59).

Defendants now seek to renege on these admissions by pointing to the deposition, in late September, of plaintiff's expert Janzen. They say that certain documents that came to light in connection with that deposition demonstrate that Janzen used a strain gauge pressure test technique that would result in measurements of *less than 50,000 psi* for the accused cartridges. Plaintiff counters by stating that he is not relying on the Janzen test results, but rather the defendants' admissions, to establish that the 50,000 psi limitation is met in the accused products. He also points out that the accused cartridges are accepted by SAAMI as safe at 65,000 psi. (PX 21)

The SM explained to the parties that he could not possibly recommend a ruling on the import of this evidence without briefing. The issues involved are technologically complex. Also, any resolution may well require exercise of the Court's discretion on the important question of whether defendants should be relieved of their admissions, upon which both plaintiff and the SM have relied in dealing with this motion. The SM also explained that he was not willing to recommend to the Court that issuance of this report be delayed pending some future resolution of those questions. Appropriate procedure would seem to require defendants to file a formal motion seeking relief from any partial summary judgment of infringement that may be entered by the Court based upon the following recommendation.

## Recommendation as to Literal Direct Infringement

In view of the foregoing, it is concluded that genuine issues of material fact preclude summary judgment as to claims 10, 11, 19 and 20 of the '717 patent, claims 1-4, 9, 10 and 19 of the '138 patent, claims 18 and 30 of the '174 patent, and claims 10 and 20 of the '983 patent. Plaintiff has demonstrated, by a preponderance of the evidence, literal infringement of the remaining asserted claims, without intrusion of any genuine issue of material fact. **Accordingly, it is recommended that partial summary judgment of literal direct infringement be entered in plaintiff's favor with respect to the following products and claims:**

- **Factory-loaded 270 WSM, 7mm WSM, and 300 WSM cartridges literally infringe each of claims 11-14 of the '138 patent.**

- Factory-loaded 223 WSSM, 243 WSSM, and 25 WSSM cartridges literally infringe each of claims 1-2, 5-9, 12, 13 and 16-18 of the '717 patent). Factory-loaded 25 WSSM cartridges also literally infringe each of claims 3 and 14 of the '717 patent.

- All A-Bolt and BLR rifles chambered for WSM Cartridges infringe claims 1-4 of the '174 patent, and all Model 70 rifles chambered for WSM cartridges infringe claims 1-4 and 31 of the '174 patent.

- All A-Bolt rifles chambered for WSSM cartridges infringe claims 1-2, 3 (25 WSSM only), 5-8, 12-13, 14 (25 WSSM only), and 16-18 of the '983 patent. All Model 70 rifles chambered for WSSM cartridges infringe claims 1-2, 3 (25 WSSM only), 5-8, 11-13, 14 (25 WSSM only), 16-18, and 21 of the '983 patent.

## INDUCEMENT OF INFRINGEMENT (Motion 2)

Indirect infringement by inducement is accounted for in 35 U.S.C. §271(b), which provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." Section 217(b) is often used to invoke personal liability on the part of corporate officials who actively aid and abet their corporation's infringements.[25] It is also employed to create vicarious liability in one who sells a product intending that it be used in a patented method[26] or system.[27] In the present case, plaintiff's basic contention (for purposes of this motion), is that Browning has actively induced infringement of the cartridge patents by Olin. In other words, by making and selling its accused firearms, and

---

[25] See, e.g., Sensonics Inc. v. Aerosonic Corp., 81 F.3d 1566, 38 USPQ2d 1551 (Fed. Cir. 1996).
[26] Moleculon Res. Corp. v. CBS Inc., 793 F.2d 1261, 229 USPQ 805 (Fed. Cir. 1986).
[27] See, e.g., Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 70 USPQ2d 1369 (Fed. Cir. 2004).

by promoting them, it has encouraged Olin to make and sell cartridges intended for use in those firearms.

Browning poses two fundamental defenses to this contention. First, it says that, as a matter of law, no act by it prior to the issuance of the patents can constitute an act of inducement. (B2M at 4) Second, it says that plaintiff has not proffered, and cannot produce, evidence of the specific intent required for liability under §271(b). (B2M at 5) Browning is clearly correct on the first point, but – in the view of the SM – wrong on the second.

Taking the second point first, in one of its early looks at the subject, the Federal Circuit explained that "a person infringes by actively and knowingly aiding and abetting another's direct infringement. Although section 271(b) does not use the word 'knowing,' the case law and legislative history uniformly assert such a requirement. * * * While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice. * * * The requisite intent to induce infringement may be inferred from all of the circumstances."[28] But what is it that the inducer must have intended? Quite remarkably, this remains, in Federal Circuit jurisprudence and elsewhere, the major unanswered question about §271(b). In Insituform v. CAT,[29] the Federal Circuit admitted that

> there is a lack of clarity concerning whether the required intent must be merely to induce the specific acts or additionally to cause an infringement. *See Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990) ("The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements."). *But see Hewlett-Packard Co. v. Bausch & Lomb, Inc.,* 909 F.2d 1464, 1469 (Fed. Cir. 1990) ("Proof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement.").

---

[28] Water Techs. Corp. v. Calco, Ltd., 850 F.2d 660, 7 USPQ2d 1097, 1103-04 (Fed. Cir. 1988).
[29] Insituform Tech. Inc. v. CAT Contr. Inc., 385 F.3d 1360, 72 USPQ2d 1870, 1884 (Fed. Cir. 2004).

> Nevertheless, we need not resolve any ambiguity in the case law on this
> point because there is sufficient evidence to support the district court's
> finding under either standard.

A few months later, in <u>MercExchange v. eBay</u>,[30] the court repeated this observation, but

concluded that "[n]evertheless, a patentee must be able to demonstrate at least that the

alleged inducer had knowledge of the infringing acts in order to demonstrate either level

of intent." Because it concluded that knowledge was lacking, it was able to avoid

choosing between the <u>Manville</u> standard and the <u>Hewlett-Packard</u> standard.

We, too, can escape the necessity of choosing between <u>Manville</u> and <u>Hewlett-</u>

<u>Packard.</u> If the Federal Circuit is determined to leave the patent bar and bench adrift on

this question, then it behooves us to examine very carefully the facts of the cases it has

decided on the subject. <u>Insituform</u> is very instructive in this connection. Note that

<u>Insituform</u> was able to avoid the question "because there is sufficient evidence to support

the district court's finding under either standard." If we look at that evidence, then, we

ought to be able to tell just what it is that the court regards as sufficient to meet the more

stringent <u>Manville</u> standard. In <u>Insituform</u>, the district court, applying the <u>Manville</u>

standard, found that the acts of inducement occurred with full knowledge that the induced

activity had been accused of infringement. On this basis, the Federal Circuit affirmed the

district court's finding of intent. Given its statement that the evidence was sufficient

under either <u>Manville</u> or <u>Hewlett-Packard,</u> this can only be taken as a clear holding that

evidence of acts of inducement that occur with knowledge that the patentee regards the

induced activity as infringing is sufficient under the stricter <u>Manville</u> standard. Or, to

place it in the context of the present case, evidence that Browning sold rifles especially

chambered for the accused WSSM and WSM cartridges, with knowledge that plaintiff

---

[30] <u>MercExchange LLC v. eBay Inc.,</u> 401 F.3d 1323, 74 USPQ2d 1225, 1232 (Fed. Cir. 2005)

regarded those cartridges as infringements, would create a genuine issue of fact as to

Browning's intent. Whether something less would suffice, we know not, in view of the

Federal Circuit's refusal, so far, to clarify the matter. But what we do know is that acts of

inducement, with knowledge that the induced activity is considered an infringement by

the patentee, does suffice.

Obviously there is such evidence in this case, on this record. For example,

Browning has continued to sell the accused rifles, chambered especially for the accused

WSSM and WSM cartridges, after the issuance of the patents in suit and subsequent to

the commencement of this action. (B2MS ¶¶10-17) This alone creates a genuine issue of

fact material to Browning's intent, and precludes the summary judgment it seeks.

However, Browning is most definitely correct on its first point, which is that

alleged acts of inducement that take place prior to the issue dates of the patents in

question do not count in the infringement equation. As the Federal Circuit expressed it in

National Presto v. West Bend,[31]

> The threshold question is whether the absolute rule of law adopted by the
> district court is correct. There are cogent arguments of fact, law, and
> policy on both sides of the issue, as have been thoroughly presented by the
> parties. We conclude that the district court was correct, and that as a
> matter of law Section 271(b) does not reach actions taken before issuance
> of the adverse patent. Although the tort of inducement is itself prospective,
> in that the direct infringement will not have occurred until after the acts of
> inducement, when no patent has issued at the time of the inducement there
> can not be a violation of Section 271(b). The principle of liability for
> "aiding and abetting" the wrongful acts of others is not imposed
> retrospectively, to make illegal an act that was not illegal when it was
> done. That is, if the thing that was abetted was not illegal at the time of
> abetment, but depended on some future event that might not occur (such as
> issuance of the patent) liability can not be retroactively imposed. As
> discussed in *Camp v. Dema*, 948 F.2d 455 (8th Cir. 1991) with respect to
> violation of the securities laws, "aiding and abetting not only requires
> assistance, but also knowledge of a wrongful purpose." The purpose must
> be wrongful at the time of the action with which the abettor is charged.

---

[31] National Presto Indus. Inc. v. West Bend Co., 76 F.3d 1185, 37 USPQ2d 1685, 1693 (Fed. Cir. 1996).

> We take note of the thoughtful district court decisions to the contrary, with
> reference to particularly egregious actions by the party charged. In
> *Procter & Gamble*, 3 USPQ2d 1207 (D. Del. 1985) the court referred to
> misappropriation of confidential information and illicit delay of patent
> issuance by the accused inducer, and other misconduct of the nature of
> fraud and unfair competition. We do not hold that such improper actions
> are insulated from remedy. However, we hold that the general rule is that
> inducement of infringement under Section 271(b) does not lie when the
> acts of inducement occurred before there existed a patent to be infringed.

There is no mistaking the import of this language. Nothing that Browning did prior to the issuance of the '138 and '717 cartridge patents can, as a matter of law, create liability for inducement of infringement of those patents. Browning is entitled to summary judgment to that limited extent. Also, because evidence of preissuance acts by Browning may well be arguably relevant to other issues, such as willfulness, the jury should be given a cautionary instruction.

## Recommendation as to Inducement

**Accordingly, it is recommended that Browning's motion be denied, except to the extent that it seeks judgment regarding preissuance activity. As to such activity, it is recommended that (1) Browning be granted a partial summary judgment declaring that none of its acts that occurred prior to the issuance of the '138 and '717 patent, respectively, create any liability for inducement of infringement of those respective patents under 35 U.S.C. §271(b); and (2) the jury be instructed that evidence with respect to preissuance activity, while it may be relevant to other issues in the case, cannot create liability for inducement.**

## WILLFUL INFRINGEMENT (Motion 8)

In this motion, Browning contends that plaintiff has not produced sufficient evidence to create a genuine issue of fact material to his charge that Browning's alleged infringement was willful. Owing to the particular circumstances of this case, Browning's motion raises some questions about willful infringement that are both difficult and interesting.

In the patent infringement context, willfulness of behavior is a classical jury question of intent,[32] a determination as to a state of mind.[33] In SRI v. Advanced,[34] the Federal Circuit summarized as follows:

> Although various criteria have been stated for determining "willful infringement," which is the term designating behavior for which enhanced damages may be assessed, the primary consideration is whether the infringer, acting in good faith and upon due inquiry, had sound reason to believe that it had the right to act in the manner that was found to be infringing. The law of willful infringement does not search for minimally tolerable behavior, but requires prudent, and ethical, legal and commercial actions. Thus precedent displays the consistent theme of whether a prudent person would have had sound reason to believe that the patent was not infringed or was invalid or unenforceable, and would be so held if litigated. * * * A factor to be considered is whether the adjudged infringer relied on legal advice. When this defense is raised the court may consider the nature of the advice, the thoroughness and competence of the legal opinion presented, and its objectivity. The court will determine whether the advice of noninfringement or invalidity or unenforceability could have reasonably been relied on, and whether, on the totality of the circumstances, exculpatory factors avert a finding of willful infringement. The totality of the circumstances may include not only such aspects as the closeness or complexity of the legal and factual questions presented, but also commercial factors that may have affected the infringer's actions. Aspects in mitigation, such as whether there was independent invention or attempts to design around and avoid the patent or any other factors tending to show good faith, should be taken into account and given appropriate weight. Willful infringement is a question of fact, * * * and must be established by clear and convincing evidence, for "the boundary between unintentional and culpable acts is not always bright." * * * Since the issue of willfulness not only raises issues of reasonableness and prudence, but is often accompanied by questions of intent, belief, and credibility, appellate

---

[32] Richardson v. Suzuki Motor Co., 868 F.2d 1226, 9 USPQ2d 1913, 1932 (Fed. Cir. 1989).
[33] Read Corp. v. Portec Inc., 970 F.2d 816, 23 USPQ2d 1426, 1436 (Fed. Cir. 1992).
[34] SRI Int'l Inc. v. Advanced Tech. Labs. Inc., 127 F.3d 1462, 44 USPQ2d 1422, 1423-24 (Fed. Cir. 1997).

review requires appropriate deference to the special role of the trial court
in making such determinations. (Citations omitted; emphasis added.)

The Federal Circuit's recent en banc <u>Knorr-Bremse</u> decision[35] appears to have left

these observations valid and intact. As the SM previously pointed out in the Report and

Recommendation of Special Master Regarding Browning Election Re: Advice of Counsel

(Election Report), for present purposes, the <u>Knorr-Bremse</u> decision has only two

important aspects. First, it held unequivocally that "[a]n adverse inference that a legal

opinion was or would have been unfavorable shall not be drawn from invocation of the

attorney-client and/or work product privileges or from failure to consult with counsel.

Contrary holdings and suggestions of precedent are overruled." 72 USPQ2d at 1568.

Second, it expressly passed the "question of whether the trier of fact, particularly a jury,

can or should be told whether or not counsel was consulted (albeit without any inference

as to the nature of the advice received) as part of the totality of the circumstances relevant

to the question of willful infringement." <u>Id.</u> at 1567. (Election Report at 3) In adopting the

Election Report, the Court also adopted its recommendation that Browning be precluded

from telling the jury, by way of defense to plaintiff's charge of willfulness, that it relied

upon advice of counsel, unless it was willing to produce any opinions of counsel. In

response, Browning has elected not to tell the jury that it relied upon opinions of counsel.

(B8R at 17)

In view of <u>Knorr-Bremse,</u> the fact that Browning obtained its opinion of counsel

only after commencement of this litigation tends to minimize the impact of post-

commencement activity on the willfulness inquiry. As Browning persuasively argues, it

would be unfair for plaintiff to assert to the jury that it conducted no meaningful

---

[35] <u>Knorr-Bremse Systeme F. N. GMBH v. Dana Corp.</u>, 383 F.3d 1337, 72 USPQ2d 1560 (Fed. Cir. 2004).

investigation into his patents subsequent to the filing of this suit. For one thing, this

would suggest to the jury that Browning did not obtain opinions of counsel. The SM

agrees; sauce for the goose is sauce for the gander. If Browning is to be precluded from

telling the jury that it relied upon advice of counsel, plaintiff must be precluded from

suggesting that Browning did not obtain an opinion. For another thing, it will be obvious

to the jury that Browning's litigation lawyers did, at some time, make an investigation

and interpose defenses that can be presumed, in view of Rule 11, FRCP, to have been

done in good faith.

      Absent an initial presentation of evidence on the issue of willfulness, the burden

of coming forward in defense does not arise. There is no evidentiary presumption that

every infringement is willful. The patentee must present threshold evidence of culpable

behavior.[36] In view of the foregoing <u>Knorr-Bremse,</u> about all plaintiff will be able to say

about post-commencement activity is that Browning continued the alleged infringing acts

after being sued. But this is, in the view of the SM, sufficient to discharge his burden of

presenting clear and convincing threshold evidence. Exercising due care, a party may

continue to manufacture and may present what in good faith it believes to be a legitimate

defense without risk of being found on that basis alone a willful infringer. But this does

not mean that a party that continues its accused infringing activity after a patentee files

suit cannot be guilty of willful infringement as long as that party presents a non-frivolous

defense to infringement.[37] Similarly, in view of <u>Knorr-Bremse,</u> about all Browning will

be able to say is that its litigation lawyers have presented substantial defenses. But in

<u>Knorr-Bremse</u> itself the en banc court made clear that there is no per se rule that the

---

[36] <u>Norian Corp. v. Stryker Corp.</u>, 363 F.3d 1321, 70 USPQ2d 1508, 1517 (Fed. Cir. 2004).
[37] <u>Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l Inc.</u>, 246 F.3d 1336, 57 USPQ2d 1953, 1961 (Fed. Cir. 2001).

existence of a substantial defense to infringement is sufficient to defeat liability for willful infringement even if no legal advice has been secured. This is simply a factor to be considered with others among the totality of circumstances, stressing the theme of whether a prudent person would have sound reason to believe that the patent was not infringed or was invalid or unenforceable, and would be so held if litigated.[38]

This leaves Browning and plaintiff in equipoise as regards evidence of post-commencement activity bearing upon willfulness. Each has offered substantial clear and convincing evidence from which a jury could find, but is not compelled to find, willfulness in view of the overall circumstances of this case. This alone would be sufficient to defeat summary judgment.

With respect to pre-litigation activity, Browning argues that such is irrelevant to the willfulness inquiry, because it "performed extensive research and development activities, and commenced manufacture of the accused products prior to receiving notice of the patents-in-suit and prior to commencement of the litigation." (B8M at 4) It cites Federal Circuit caselaw for the proposition that "[t]o willfully infringe a patent, the patent must exist and one must have knowledge of it."[39] A brief look at the chronology of events is helpful here. (See B8M at 5-6) Plaintiff filed the first of his applications in March of

---

[38] Knorr-Bremse Systeme F. N. GMBH v. Dana Corp., 383 F.3d 1337, 72 USPQ2d 1560, 1567 (Fed. Cir. 2004). A defensive pleading of invalidity or unenforceability may pass muster under Rule 11, yet not provide adequate defense to the charge of willful infringement. L.A. Gear Inc. v. Thom McAn Shoe Co., 988 F.2d 1117, 25 USPQ2d 1913, 1919 (Fed. Cir. 1993). Defenses prepared for a trial are not equivalent to the competent legal opinion of noninfringement or invalidity which qualify as "due care" before undertaking any potentially infringing activity. Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l Inc., 246 F.3d 1336, 57 USPQ2d 1953, 1961 (Fed. Cir. 2001).

[39] State Indus. Inc. v. A.O. Smith Corp., 751 F.2d 1226, 224 USPQ 418, 425 (Fed. Cir. 1985). See also Gustafson Inc. v. Intersystems Indus. Prods. Inc., 897 F.2d 508, 13 USPQ2d 1972 (Fed. Cir. 1990). In a later case, however, the court said that "although willfulness is generally based on conduct that occurred after a patent issued, pre-patent conduct may also be used to support a finding of willfulness." Minnesota Min. & Mfg. Co. v. Johnson & Johnson Orthopaedics Inc., 976 F.2d 1559, 24 USPQ2d 1321, 1340 (Fed. Cir. 1992). These cases were decided at a time when U.S. patent applications were uniformly inaccessible to the public. But as plaintiff concedes (B8R at 7 n.4), under current law (35 U.S.C. §122(b)), applications are generally published eighteen months after the earliest priority date. Thus, the applications for all four of the patents in suit had been published prior to the commencement of this litigation. (See P8AS at 29)

1997, with the earliest patent (the '361, not in suit) issuing in October of 1998. By early

2001, Browning had developed and started selling accused rifles chambered for the

accused .300 WSM cartridges. The first of the patents in suit (the '174) issued in April of

2003, and the second (the '138) in July of 2003. This suit was commenced on July 30,

2003. Also, the patent applications for all four of the patents in suit had been published

prior to commencement.[40]

Browning says that it had no actual notice of these patents prior to suit, and thus

cannot be guilty of willful conduct as a matter of law.[41] But the real question is whether,

in light of all the circumstances, Browning conducted itself in a reasonably prudent

fashion with respect to plaintiff's patent rights. There is substantial evidence that

Browning had reason to know, and the means to know, of two of patents the patents in

suit well prior to commencement of this litigation. In a letter dated February 8, 2001

(Plaintiff's Ex. 37 at 3), plaintiff's attorney, Jacob Vilhauer, called Browning's attention

to his issued '361 patent (not in suit) and "pending patent applications relating to such

firearms and their cartridges." No specific identification of the applications was provided,

but Vilhauer did indicate that the impetus for the letter was Browning's announcement

that it

> intends to introduce a series of short-action rifles to chamber the
> Winchester 300 WSM cartridge, and that the new rifles will feature an
> open bolt face. We have no access, as yet, to the new rifles and therefore
> make no accusation of infringement at this time. However the 300 WSM
> cartridge is only a slight variation of a cartridge which our client helped
> Winchester develop in confidence for chambering in another
> manufacturer's rifle covered by the foregoing patent. * * *

---

[40] See note 39.

[41] Browning also argues that there is no evidence that it deliberately copied the plaintiff's invention. (B8M at 7-8) Strangely, the evidence it cites to refute any possible inference of copying does nothing of the kind. Browning points out that plaintiff had published advertisements and articles that provided details of the claimed invention. All this proves is that it would have been easy to copy his claimed invention.

A reasonable jury could infer from this that plaintiff was indicating his belief that

Browning's planned rifle, when chambered for the .300 WSM, might well infringe the

'391 patent and possibly other patents that might issue from the pending patent

applications. Apparently this was Browning's take on the letter: the recipient

characterized it as a "legal letter challenging Olin's ownership of the rights on 300WSm."

(Plaintiff's Ex. 38)

Despite the truism that one cannot willfully infringe a nonexistent patent,

knowledge that a patentee has related pending patent applications on file can certainly

have a bearing on willfulness. This case provides an apt example. Browning complains

bitterly that "[i]nstead of providing notice to the Browning Defendants, Mr. Jamison was

secretly pursuing submarine patents and trying to claim the Browning WSM and WSSM

firearms, and the Olin WSM and WSSM cartridges. They were on the market. Mr.

Jamison and his lawyers acquired them. Mr. Jamison and his lawyers tried to claim

them." (B8R at 12-13) But, as the Federal Circuit has made plain,

> there is nothing improper, illegal or inequitable in filing a patent
> application for the purpose of obtaining a right to exclude a known
> competitor's product from the market; nor is it in any manner improper to
> amend or insert claims intended to cover a competitor's product the
> applicant's attorney has learned about during the prosecution of a patent
> application. Any such amendment or insertion must comply with all
> statutes and regulations, of course, but, if it does, its genesis in the
> marketplace is simply irrelevant and cannot of itself evidence deceitful
> intent.[42]

And Browning had the means to avoid being torpedoed by the Jamison submarine. It had

been warned that he had other pending patent applications. All four of those applications

had been published by the time plaintiff filed suit; indeed, the '138 and '174 applications

were published more than a year before commencement of the litigation, and both patents

---

[42] Kingsdown Med. Cons. Ltd. v. Hollister Inc., 863 F.2d 867, 9 USPQ2d 1384, 1390 (Fed. Cir. 1988).

issued prior to commencement, the '174 patent several months prior. Browning could have located those publications, assessed them, and continued to monitor the situation vis-à-vis its own commercial plans.[43] Had it done so it would also have become aware of the issuance of the '174 and '138 patents prior to commencement of the litigation. All of this constitutes substantial evidence from which a jury could reasonably conclude that a prudent competitor would have taken such steps, in order to keep itself informed and to enable it to assure itself that what it was doing commercially would not create liability for patent infringement. It is clear, therefore, that genuine issues of fact material to the alleged willfulness of Browning's conduct, both prior to and after the filing of this suit, prevent summary judgment in its favor.

At oral argument, Browning called to the attention of the SM a very recent decision of the Federal Circuit, <u>Mallinckrodt Inc. v. Masimo Corp.</u>, Appeal No. 04-1495, -1540 (Sept. 7, 2005). In that case, a panel of the court appeared to hold that actual knowledge of a pending application that disclosed the inventions claimed in the patents in suit did not trigger the obligation of due care to avoid infringing those patents. As the court concluded, there was no "specific evidence upon which a reasonably jury could have found that [the alleged infringer] was, <u>for certain</u>, aware of" those patents prior to commencement of suit. (Slip Op. at 19; emphasis added.) There is, however, a threshold problem with the <u>Mallinckrodt</u> decision: it was designated, pursuant to Federal Circuit Rule 47.6, as a disposition that "is not citable as precedent." Moreover, it does not in any event appear to be inconsistent with existing precedential decisions of the court that suggest that, regardless of pre-litigation or pre-issuance knowledge, post-litigation and

---

[43] Indeed, one of its employees, Marcus Heath, reviewed the '174 patent application in early 2002 and noted similarities between the WSM cartridges and firearms and the cartridges and firearms described in the application. (B8RS ¶¶88-89)  Browning's counsel sent the prosecution history of that application to Olin's counsel in July 2002. (Plaintiff's Exhibit 872; SLATE 6799)

post-issuance activity can be considered as part of the body of evidence bearing on the

question of willfulness.[44] The <u>Mallinckrodt</u> decision does not, in the view of the SM,

provide a basis for the grant of summary judgment on Browning's motion.


## Recommendation as to Willfulness

**Accordingly, it is recommended that Browning Defendants' Motion for Partial Summary Judgment on Plaintiff's Willful Infringement Claim be denied. It is also recommended that, inasmuch as Browning is precluded from suggesting to the jury that it relied upon advice of counsel, plaintiff be likewise precluded from suggesting to the jury that Browning did not seek advice of counsel, particularly by arguing that Browning did nothing to investigate its potential liability after being sued.**


Respectfully submitted,


*Robert L. Harmon*


Robert L. Harmon

Special Master


---

[44] See summary of cases cited in <u>Gustafson Inc. v. Intersystems Indus. Prods. Inc.</u>, 897 F.2d 508, 13 USPQ2d 1972, 1974-75 (Fed. Cir. 1990). See also <u>National Presto Indus. Inc. v. West Bend Co.</u>, 76 F.3d 1185, 37 USPQ2d 1685, 1690 (Fed. Cir. 1996).